Good afternoon. This is Judge Livingston on the line. We are conducting this on box telephonically and the procedure we're going to use is that the appellate will begin with two minutes of uninterrupted time and then we'll have a round of questioning from the judges in segments of three minutes each including both the time for the question and the answer and then the appellee will argue with four minutes to start and a round of questioning and then we'll hear rebuttal. Everyone I suspect is on the line but just to make sure, let me do a quick roll call of the judges who I believe have all been joined. Judge Calabresi? I'm here. Judge Loewe? Present. Judge Carney? Present. Judge Sullivan? Present. Judge Bianco? Present. Judge Park? Present. Judge Nardini? Here. And Judge Menashe? Yes, I'm here. Thank you all. I think we are ready to begin. We'll hear from the appellate. Mr. Egan? Chief Judge Livingston and may it please the court. This case comes before the en banc court during a national reawakening concerning the often aggressive and sometimes violent policing of minorities. Within that context, the story of this case is all too familiar. Three officers proactively policing a minority community during daylight hours saw a black man in a hoodie and suspected he was up to no good. Why? He looked at their unmarked car and pulled up his pants. So lacking grounds, the officers wanted to search so they found a way. A traffic violation. Officer Tom rushed to the car and saw Calvin Weaver adjusting in the passenger seat, kind of squirming and kind of pushing down on his pelvis. Though compliant, Weaver was door, Officer Tom forcefully commanded Weaver to raise his hands, turn over his identification and exit the car. While these actions might be excused as safety related measures, what came next could have only been constitutional if supported by a reasonable suspicion that Weaver was armed and dangerous. Officer Tom ordered Weaver to submit to an intrusive inspection by assuming a spread eagle position while he approached from behind and thoroughly patted down Weaver's most intimate areas. But nothing in the totality of the circumstances reasonably suggested that Weaver was armed or dangerous. He was compliant and the police were only investigating a traffic violation. Moreover, the public region is not a common sanctuary for weapons. There's no physical or auditory addition of a weapon. No training or experience suggested a weapon would be found in these circumstances and the location of any object made it less, not more readily accessible. As a meekie note, if this were nearly any other similar case, Officer Tom would have found nothing and Weaver would have had little if any recourse. We are here because this happens to be one of the rare instances in which overbearing police practices happen to uncover evidence. However, the police's fortuity should not excuse the constitutional violation. Thank you. Thank you. Mr. Egan, can I ask, your briefing talks about whether the command to assume the on-search position was a search or a seizure, but we don't have to decide that if we conclude that there was reasonable suspicion at the time Officer Tom ordered your client to exit the vehicle. So, could I ask you to address that? And let me say, the district court credited the officer testimony about Mr. Weaver staring at the unmarked car and the testimony about adjusting his waistband. And most significantly, the district court credited the testimony that as the approach that his officer Tom approached the car, he saw Mr. Weaver pushing something down in what was characterized as an abnormal way, trying to conceal something in the area of his waistband. In your briefing, you say that that's not enough to raise a reasonable suspicion because this could have been drugged as easily as a weapon. But isn't that essentially transforming reasonable suspicion into a preponderant standard? And if it's not, can you help me understand why not? Okay. So, Chief Judge Livingston, first, you're correct. You don't have to reach that question if you find that the totality of the Weaver was armed and dangerous. So, addressing then whether there was reasonable suspicion at that point. So, our position is that there was not, obviously, because all that could be concluded reasonably is that Calvin Weaver may have something in his pants that we can see that was a rational inference to conclude only that much. Whether it was something even illicit, I'm not prepared to concede. But on the basis of rational inference that he believed he was hiding something, that's plainly not enough because under Terry, you have to have particularized suspicion that it is a weapon. Terry itself talks about suspicion of general criminality being potentially enough to make the stop. And if that were all we were talking about, then perhaps, yes, he would have been entitled to stop Calvin Weaver. Terry requires the additional information and reasonable conclusion that he may possess a weapon. And that score, there was nothing to say with particularity what it would be. As I've noted, the location is not a common sanctuary for weapons. There's no physical or auditory addition, no bulge, no outline, no imprint, no sound, no clip of magazine, no training or experience of Officer Tom suggested that a weapon would be found in these circumstances. And additionally, by seeking Weaver's actions, made it whatever he thought to keep private less readily accessible and therefore made him, whatever suspicion might be derived from that, made him less dangerous. Judge Calabresi? Yes. Am I right, counsel, that in cases denying suppression, reliance has been usually based on an interpretation by an experienced officer of otherwise seemingly innocuous actions, that is, the actions that the defendant has taken, like pulling his pants or pushing down on something, are things which in themselves are innocuous. But the cases that have gone against suppression have been ones where an officer has been able to say, I have experience, and that kind of action is, in fact, an indication that there might be a weapon. And that, in other words, one has to give faith to that officer's statement in order to deny suppression. Am I right? That's correct, Your Honor. And that's essentially what Terry holds. Officer McFadden in that case made an observation of a series of what might be described as innocuous, innocent, or ambivalent conduct that in and of themselves, none of them in themselves suggested any criminality, but together with his 30 years of experience, was able to put those observations together, the multiple times of appearing to case the store in that case, walking past it on more than a dozen occasions and meeting back up together, and put those together to suspect that the two men, and possibly a third, were planning a stick-up, and obviously a robbery with a gun. And so, therefore, it was reasonable to conclude that a gun would be likely on one of them. He couldn't say which, but given the nature of the crime suspected and his experience, he was then entitled to stop them, grab Terry by the arm, spin him around, which is equivalent in our case to ordering Weaver to assume the spread-eagle position, and then frisk him. Thank you. That's all my only question. Judge Cabrera? Mr. Egan, in his separate opinion on the panel, Judge Calabresi described this case as, quote, on the law, a close case, quote, unquote. Would you agree with that? I respectfully would not put it quite so charitably, no. But it's obviously close enough to garner a dissent and to require an en banc rehearing, so I think there's some validity to that statement. But personally, no, I think it's not a close case. All right, so let's turn to the facts found by Judge Thedeby. The facts that he set them forth were the subject of an evidentiary hearing before the district court, is that right? That's correct, Your Honor. And who testified before Judge Thedeby? Only Officers Quance, who was the driver of the car, and Officer Tom, who was the front seat passenger. There were three officers. The third did not testify, and the defendant did not testify. And is Judge Thedeby's account of the facts, we're not dealing with the law quite yet, is Judge Thedeby's account of the facts consistent, in your view, with the statement of facts by the officers and by the government here? Yes, more or less, Your Honor. I have not challenged any finding of fact. All right, so you have not challenged any factual finding by Judge Thedeby, is that right? That's correct. And Judge Thedeby credited the testimony of the officers, correct? Did, Your Honor, yes. Okay, thanks. That's all I have to ask for now. Judge Pooler? Thank you. Mr. Egan, to get to the gun that Calvin Weaver was carrying, Officer Quance had to unzip his fly and then unbutton his long underwear. So this was not, like in Hussein, readily accessible. Should this affect our dangerous analysis? Well, I think it affects it, but more so in the initial observation Officer Tom makes of Weaver as he's sitting in the car and appears kind of squirming and kind of pushing on his pelvis. In that case, because Officer Tom could see nothing, no indicia of a weapon, if he were to come to some sort of belief that there was a weapon, it would have to have that point been so hidden and so inaccessible as to essentially neutralize any threat that Weaver might have presented. Of course, Officer Tom... That's the answer to my question. Can you tell me how much time elapsed between the order to Calvin Weaver to get out of the car before he was directed to assume the search position? I don't believe the record states with any certainty on that, but I think the fair reading is that it's immediate, that he's ordered out of the car and told, once he's out of the car, to position himself with his hands on the car and to spread his feet in the spread-eagle position. And do you argue, as I think the majority suggested, that once Calvin Weaver was in the so-called search position, the search began? It is our position that the search began upon the order to assume the spread-eagle position, because indeed there is no other purpose for that order. This is not like he was going to tell Calvin Weaver to assume that position, stay there so that he could go talk to the driver or do some other action related to the mission of the stop. Search was inevitable once he was in the search position. Correct. In your brief, you cite to an article entitled, Walking While Black. Do you believe Calvin Weaver was the victim of racial stereotyping? Yes, Your Honor. I don't think this court should ignore the reality on the street, and as Amiki has pointed out, where black and Latino men in particular are disproportionately stopped and frisked at alarmingly higher rates. Officer Kwan described the area, the quote-unquote high-crime area, as co-extensive essentially with the predominantly black neighborhoods of Syracuse. And Calvin Weaver was selected because he fit some profile, they don't specify what, that the officers then wanted to search him. All right, Judge Chen. Yes, Mr. Egan, you've essentially conceded that there was reasonable suspicion that Mr. Weaver may have had something in his pants and he was hiding something. And is that enough for there to be reasonable suspicion that the individual was armed and dangerous? Well, no, Your Honor. I think you, although it's titled, referred to as a high-crime area, you still have to determine how much weight to put on that label. And I would argue that not much in this case. There's unsubstantiated claims that about, but lacking no recency, frequency, or demographic specificity as to the types of crime. As I've already mentioned, the area is indeed co-extensive with the predominantly black neighborhoods of Syracuse, which require more particularity. There's no knowledge of why Weaver's in that area. He's seen first walking and then getting in a car that is driving out of the quote-unquote high-crime area at the time 5 o'clock. I mean, what is the difference between reasonable suspicion that an individual has something versus the individual has a weapon? I mean, I guess you kind of alluded to it early, but what indications are there that there's indeed a danger or a weapon? I mean, not necessarily in this case, because you're saying there isn't any, but what would a reasonable police officer see that would indicate that the individual's arms are dangerous? Well, I think this court's decision in Padilla provides a perfect example. In that case, the two officers were surveilling a known or suspected drug building. They see two men approach a third, appeal off into an unlit area and suspect a drug deal or a robbery. And then as they come out, they see the would-be defendant, Padilla, adjust an object in his pants that is consistent with how other officers adjust a weapon and how he's seen people he's arrested adjust an object, or in that case, a firearm. In this case, there is nothing like that. It's merely that Calvin Weaver's movements in the car may allow for an inference that maybe he's hiding something. But what? That's the point. If all that was required were general criminality, that would be different. But as I mentioned already, Terry requires a reasonable conclusion that he may be armed and dangerous. And on that score, there is nothing that would allow Officer Tom to even include a weapon in the possibilities. Thank you. Judge Lillian? Thank you, Chief Justice Livingston. Mr. Egan, I will say at the outset that I'm very sympathetic to some of what I'll describe as higher-level concerns that you and the amici have expressed. But I wonder if you might help me understand a few things about your position with respect to when the frisk started here, or when a frisk starts, even though, as I heard you, you seem to have conceded that you don't have to address when the frisk began in this case. So as I understand it, your position is that Officer Tom engaged in a frisk as soon as he was arrested. Is that pretty much accurate? That's accurate, Your Honor. But can I clarify my concession? I'm not conceding that there was reasonable suspicion to search Calvin Weaver at any point. I'm merely saying that the court... You conceded that we don't have to address the issue of when the frisk began, correct? If you and only if you find there was reasonable suspicion before the order was issued. But I'm not conceding that there was by any means, no. Yes, but... Let me ask you a few questions about the frisk itself and when it started. Suppose that Officer Tom had ordered all three of the men who were inside the car, including Mr. Weaver in this case, to get out of the car at the same time, spread eagle, and place their hands on the car. Would that order to all three men have constituted a fit? So in this hypothetical, there's one officer who's ordering three men to the search position? Yes, there would be. Yes, Your Honor. There's no other reason for it, Your Honor. That's the position. So even though... So at the point of ordering all three men to get out of the car and place their hands on the car and spread eagle, that would constitute a frisk of all three men? Yes, that's correct, Your Honor. That's... Suppose that Officer Tom had, for whatever reason, he was distracted or changed his mind and decided not to touch Mr. Weaver after he had assumed the spread eagle position, would we still, in your view, have to conclude that he had started to frisk Mr. Weaver upon instructing him to spread eagle? I think that's a logical conclusion, but you could also find that it was an increase, impermissibly increased the level of intrusion that was necessary, that was reasonably connected to the scope of the search. So essentially, it was either... Even if he changed... I just want to make sure I'm getting this right. Even if he changed his mind and made that clear, that would still... The instruction to spread eagle by itself, without anything else, would constitute a frisking, in your view? Yes, Your Honor. I think that that's a fair extension of the argument, yes. Thank you very much. Judge Carney? Mr. Egan, good afternoon. I'd like to follow up with you a little bit on this spread eagle directive. It occurred to me that the spread eagle directive might make particular sense in circumstances in which the officer, as Officer Tom did here in the district court found, appeared to be concealing something in his groin area between his legs, but that in other circumstances, it might not. So Mr. Weaver, upon assuming a spread eagle position, might dislodge or cause something to fall to the ground even before he was patted down. Would you concede that in some circumstances, directive to spread eagle might be justified on a reasonable suspicion, and in other circumstances, not? I know, Your Honor, because I think that the purpose of Terry is to allow the full pat down, and that's accomplished by spreading eagle, allow the officer to pat down the inner upper thigh areas, groin areas, backside areas of a person. Now, in this case, if all Officer Tom was trying to do was to hope that something would fall, he would still have intruded on Weaver's personal security by forcing him to assume this position, and the Fourth Amendment would still require him to have reasonable suspicion before ordering Weaver into that position. I think many people would agree that the spread eagle directive in particular is more degrading and humiliating, if you will, than a simple pat down standing on the street, which already is a pretty fair intrusion. And since in Fourth Amendment context, we're looking at reasonableness, might there be circumstances in which it is reasonable or unreasonable for Fourth Amendment purposes, and here, possibly more reasonable than other circumstances? If there's reasonable suspicion to believe he's armed and dangerous, then Terry has already sort of worked out that balance of the intrusion on the person versus the promotion of the state interest and required reasonable suspicion, then Officer Tom's allowed to do that. If you're suggesting that Officer Tom, if he just can have some sort of generalized suspicion that there's something in his pants and then order him into this position, hoping that something will fall out, then we're still dealing with the search. And we're dealing with a search that's based not on reasonable suspicion that he's armed and dangerous, but just reasonable suspicion that hopefully something will fall out. Some evidence of general criminality will shake loose somehow, and he'll be able to find it in plain view. Generally, though, in the Fourth Amendment context, do you think if there is a reasonable suspicion that someone is armed and dangerous, then a spread eagle directive is sustainable? And it's kind of binary. If there's a reasonable suspicion, then you can do spread eagle. Otherwise not. Is that right? I think so, unless the officer were to somehow know precisely that it's in his breast pocket or something, and then just pat down that area, find a gun, and have no suspicion that's in any other area. But as I understand it, once there's reasonable suspicion that a person's armed and dangerous, you're then entitled to pat down their entire body. So is that interesting? Thank you very much. Yes, thank you. Judge Sullivan? Thank you, Mr. Egan. You don't dispute, obviously, that officers can order somebody after a traffic stop out of a car, right? That's crystal clear. Mimms has worked out that level of intrusion, yes, Your Honor. And so what about raising one's hands above one's head? Did you require reasonable suspicion before an officer can order someone to do that? So as I understand, this court hasn't ruled on it. The only court I'm aware of is the Third Circuit side about the government. They've held that an officer could order a passenger while seated in a car to raise their hands. I don't think the court has to reach that. I'm asking the question, though. Is an officer asking a person to get out of the car, that's okay. Asking a person to get out of the car and raise their hands, is that impermissible unless there's already reasonable suspicion? Well, again, if the court reached that question, I would say that that should require an additional level of suspicion beyond what Mimms required. So Mimms isn't just like a carte blanche. You order somebody out of the car and the officer gets to place them in whatever position they like. Mimms and Wilson just said that in the fourth amendment balance that's required, the interest of the person versus the interest of the state, the intrusion that's accompanied by ordering somebody out of the car is outweighed by the interest. So we'd have to look at the facts. And I think that case would be a case-by-case basis. If the officer has some reason to order a person to raise their hands, then we'd have to do the balance. So I'd need to know more about what the circumstances are before I could answer that question. Well, you've said several times that you thought that there's no other reason to order somebody to be spat eagled against the car other than to conduct a search. But it would seem to me also would be relevant to making sure nobody flees, wouldn't it? So as I noticed, I don't see how that prevents fleeing. As a footnote, I mentioned where sprinters spread their legs, American football wide receivers spread their legs upon taking off in full flight. So I don't get why spreading your legs reduces the risk of flight. Well, touching the car and being in a leaning position with one's back to the officer would slow you down a little, wouldn't it? If the officer is right next to you and can grab you, sure. But that's not the point. The point is to have the person leaning back over the car and having their pelvis away from it so that the officer can reach the front and sides and inner thigh area of the person and pat them down. Well, it also isolates the hands much the way one's hands over one's head would, wouldn't it? Well, I mean, it could have that potential, but that's not the point of it. The point is just to push the person's body away from the car as I understand it so that the officer can reach the chest area down the belly, the groin, the front of the thighs, the inner back thighs, et cetera. Okay. I have a question. I'm on limited time. So I wanted to ask about the high crime area. I thought you said a minute ago, you were not contesting the factual findings of Judge Sutterby, but then it seemed like you were actually challenging whether or not this really was a high crime area. Well, sure. I mean, it's a label, right? But in every case, what Sokolow says, it's not labels that matters. It's the degree of suspicion that attaches to those labels. So what degree of suspicion attaches to this label, given that it's at five o'clock before sunset, it's on a Monday of February 15th in winter, and he's not, there's no connection to any known crimes and suspected crimes. And he's walking, getting into a car and driving away from the high crime area. I'm suggesting, although it may technically fit the label of high crime area, the weight given to that Judge Bianco. Thank you, Chief Judge Livingston. I want to follow up on Judge Sullivan's questions, Mr. Egan, because officers have to know where the line is going to be. So it's not a new fourth amendment event to order someone out of the car, but it is a new fourth amendment in your view, to tell them to spread Eagle on the car. So tell them to get their hands out of that pocket. I assume you would agree. That's not a fourth amendment event, right? A police officer, someone has in their pockets, hands in their pockets when they get out of the car, you can order them out of their pockets, right? So if I could just first push against the idea that these aren't fourth amendment events, that's not what Mims or Wilson say. They say getting out of the car is an intrusion. It's just outweighed by the officer's safety. I'm saying it requires additional suspicion in your eyes. So you need additional suspicion to tell someone to take their hands out of their pocket. So again, that would require additional facts. I mean, I don't, Wilson and Mims didn't work out. I'm suspecting you the rule might be that whenever a person gets out of the car and has their hands in the pocket for officer's safety, they should be able to say, get your hands out of your pocket, right? So that's fine. It doesn't affect this case. Sure. Yeah, I can do that. Like you said to Judge Sullivan, you're not sure you could tell them to raise their hands in the air. You could tell them to take your hand out of the pocket, but not get your hands away from your body. I think that's an additional intrusion that places, that puts the person in a more humiliating position. What case says that an officer needs additional suspicion in a car stop, a lawful car stop, to tell someone to get their hands away from their body? This is just a general Fourth Amendment framework that Mims, Wilson, Terry operate under, which is you assess the intrusion on the person, you balance it against the promotion of the legitimate state interest. So there's no physical touching of your client, that nothing's being revealed. He's coming to get his hands away from his body. You're forcing him to do something and you're restricting his liberty. So he's got to stay by the car. That's correct. I mean, I guess if you're, if you've got. This hypothetical is just extending, changing the facts of this case slightly. So if officer Tom, while your client was in the car, said, Mr. Weaver, I'm asking you to step out of the car. I'm going to pat you down. Your view would be that, that pat down has now begun because a reasonable person would understand they are being taken out of the car for a pat down, right? That's correct, your honor. It's the intrusion plus the fact. So if Mr. Weaver said in response to that, officer says, step out of the car, please. I'm going to pat you down. He says, uh, Sheriff, the, I have a gun in my pants, but it's, I have a license for it. Your view would be, even if the officer then finds the gun during the pants, during the pat down, that gun has to be suppressed because the statement was made after the search had begun. Is that, is my analysis correct under your standard? That's correct, your honor. I mean, but. Even though, even though he has a complete authority to order him out of the car, because he added the fact to do a pat down, it changes the whole analysis. Yes, your honor. All right. Thank you. Judge Park. Thank you, Mr. Egan. I'd like to ask you about the, um, the rear passenger, um, during the stop who tried to escape, um, on the passenger or on the traffic side, I guess. Um, that seems like something that the officers perceived was a signal of intent to flee. Um, and it seems to suggest, um, a possibly dangerous situation. What's your explanation for that? Um, so all we know is that he opened his door. Um, we don't know that whether he made any attempt to get out. We don't know if he even unbuckled his seatbelt. Uh, and what we do know is after he was ordered to shut it, he complied fully when he was approached by officer quants in order to raise his hands. He did so without, um, any suspicion or nervousness. Uh, and then when he was ordered to get out of the car, he did so compliantly. And then he was frisked, uh, on the basis solely of opening the door, which I think feeds into the idea that these officers were going to frisk these guys, no matter what. Um, he had no authority to frisk the backseat passenger, but he did so anyway. Well, I guess, isn't it reasonable for doctors to perceive that as a suspicious, uh, move? I think that the initial for somebody to look like, I think it was the officer's testimony that he, he thought it was an attempt to flee and not just, he wasn't throwing out a piece of gum or a cigarette. It was, I don't know how much of the body had gotten out, but, uh, yeah. Um, so nobody, no portion of the body was seen, uh, out of the car. Um, so even if there was some suspicion generated by that, it was dispelled by, uh, off the officers, um, uh, about observations of him and the content in his continuing compliance. It suggested that he was not about to flee without that. He had just opened his door for whatever reason. And now, uh, the conclusion, the reasonable conclusion to be drawn about him is that he's a compliant passenger who poses no threat. Well, wouldn't it be that he had wanted to flee, but then when his order got to complied and now, you know, what, what to do with that, I guess, remains an open question. Your interpretation as well, you know, there's no longer a threat. Okay. So even if you give, even if you read that to its fullest, what you have everything to its fullest, you've got and flight. You're just in Wardlow territory, which allows officers only to stop and to question. It doesn't allow officers to frisk. Okay. Thank you. Judge Nardini. Thank you. If I could go back to one of the hypotheticals you've been asked about and let me tweak it a little bit more. Okay. Uh, assume that there's a car with two people in it, driver and a passenger, and two police officers come along and stop it. One police officer goes to the driver. One goes to the passenger. They both ordered them out and they both ordered them to put their hands in the car. As Mr. Weaver was instructed to do the police officer on the driver's side. And just bear with me with the hypothetical has no intention whatsoever of searching the driver. He simply wants to immobilize him for his safety and ask him some questions. The police officer on the passenger side, assume that he does from the very beginning intend to search the passenger. In your view, is there any difference in our fourth amendment analysis between the two sides of the car? Um, so Judge Nardini, you said only the hands on the car. Is it also the feet are spread? Yes. Assume the same position where the hands are in the car, the feet are spread apart. Assume the exact same position involves with Mr. Weaver. Okay. So, um, you're asking about the subjective intent of the officers, right? Yeah. I want to all relevant, but it's, uh, the Supreme court just told us in, uh, Torres versus Madrid that, uh, it's not the silly subjective intent, but it's the intent as manifestly, uh, object, sorry, as objectively manifested. So what are the actions that show us intent in this, in the hypothetical, excuse me, the hypothetical you just gave me, um, the, the actions of ordering both of them out of the car and to spread Eagle over the car, uh, the, uh, objective manifestation of the officers intent, whatever he says it is after the fact is an intent, uh, is demonstrating an attempt to frisk. So let's just assume. So you're saying, let's assume that the district court here's this old police officers testify credits them both. One says, I always meant to search. And the other said, no, I was simply putting in there for safety purposes. You're saying that we would have to reject that. And we would have to assume or infer that in fact, the only logical reason that the driver's side police officer told him to do that was so he could search him even though we know for a fact he didn't. Well, um, again, you're right. Um, so I think that's a slight difference here because, um, here we have only hypothetical, not, not here. Well, I'm comparing in your case here, you're, you're positing, uh, an anomaly that is an officer who orders this position, not for the intent to search, which is not my understanding of what any officer does, but more particularly what, what the officer did in this case. But if the officer could go into court and convincingly demonstrate that from his own experience or from his training, that that was a useful measure to employ, uh, that would be a different case, be a much closer case. But on the record we have here, we have no evidence that officers ever do this and we don't have to even get there because Officer Tom immediately prints. Thank you. Judge Menashe. Thanks. So the panel opinion characterized the, um, pushing down motion as equally consistent with, uh, hiding a weapon and hiding drugs or some other non-hazardous contraband. Do you agree with that characterization? Um, I think that's, that's fair. I don't think there's anything wrong with saying that it's equally consistent. So if it's equally consistent, does that mean that there's like a 50-50 shot that it's a weapon? No, because when, uh, the reason that there's nothing wrong with this is that, uh, when an officer, uh, stops anybody, it's equally consistent that person has a gun as anything else because that, um, people stop to generally have multiple objects hidden and their person. So whether that's a gun or something else at that point, the officer could say, it's equally consistent, but it's not more likely than not. Um, is your standard for reasonable suspicion that it needs to be more likely than not that it's a gun? Why is equally consistent not enough? Because that statement has nothing to do really with the standard. It would be different if the panel had said he had reasonably concluded that he might have a gun. And that, that reasonable conclusion was equally consistent with a reasonable conclusion that he might have something else. And that would be comparing the two standards, but this isn't, this isn't an application of the standard. It's just, it's just a measure of how much, uh, suspicion that attaches to that. Okay, but it sounds like you're saying that if there's a possibility that there's a gun, it's just that there needs to be some, uh, some chance. I mean, is there a way to quantify it or articulate the chance if we, if reasonably, if equally consistent, it's not an articulation of the standard, what would the standard be if there's some chance? Um, I'm sorry. Um, so, um, uh, the only, unfortunately the articulation is not, um, always been sort of obvious, but in the Safford case, the school search case, um, um, it was discussed that, uh, reasonable suspicion is less than a probable cause and was characterized as a moderate. I understand. Okay. Moderate. Can I ask a different, a different question? You said that the reason why being ordered to, to assume the spread eagle position is a search is because the only reason to do it is because, uh, it's for the officer to conduct a search. And you said just now that it demonstrates an intent to search, but then you also said that if the officer doesn't actually do the search, if the officer decides for whatever reason, not to engage in any kind of physical inspection, it still would be a search. Um, but you, but your justification for why the search is for what's going to happen next. Right. I mean, you realize, you know, those circumstances, no private information has been revealed. I mean, in what sense would we consider that a search? Okay. Well, um, I would, I would disagree. I mean, the person is, um, being required to assume, uh, uh, you know, a subservient and demeaning position in public and to spread his legs and to, uh, reveal the inner and upper thighs and, uh, groin area of his body. So it's a search, it's a search because there is, um, the area between his legs that is now exposed. That's correct. But of course, it's also an intrusion on his personal security that falls more in the seizure line of analysis. So you don't have to necessarily, the case doesn't stand to fall with whether it's a search. Uh, uh, it's, it's also violates fourth amendment right to, uh, unreasonable seizures. Thank you, counselor. We'll hear from the appellee. May it please the court. Mr. Weaver was not pressed based on a mere hunch. This search was supported by specific articulable facts, leading an officer to reasonably suspect that Mr. Weaver may be armed. The court must review the totality of the circumstances. And here they included movements suggesting that Mr. Weaver was actively hiding something around his waistband, a place where weapons are commonly kept. The officer watched Weaver trying to push something down around his pelvis just a short while after seeing Weaver adjusted waistband on the street without making any intrusion on Weaver's body or into his private information. The officer also saw him put his waist area against the car in an abnormal way, giving an unsupported reason for doing so. Because all of these facts together and in conjunction with others supported a reasonable suspicion that Weaver may be armed and dangerous. This court should affirm the denial of Mr. Weaver's suppression motion. This court should also reject two new rules advanced by Weaver and the original panel majority. First, that in order to place one's hands on a car and separate one's feet is itself a search. This rule finds no support in the Supreme Court's Fourth Amendment search doctrine, which is concerned with obtaining information through physical trespass or privacy invasion. In order to assume one specific posture and one that is largely indistinguishable from raising your hands above your head provides no information through trespass or invading privacy. Neither does a person's belief that a search has begun or perhaps more realistically here that a search is about to begin. This new rule about when a search starts is also untenable because under Supreme Court precedent, including Pennsylvania v. Mims, Maryland v. Wilson, and Brennan v. California, an officer would be permitted to give this order during a lawful traffic stop even absent reasonable suspicion that an individual might be armed. Second, this court should reject the rule that an officer cannot conduct a frisk where it is equally likely that a hidden object is something other than a weapon. This is not and cannot be the reasonable suspicion standard. Reasonable suspicion is something less than a preponderance of the evidence and less even than probable cause. It is not a comparative standard that assesses how likely a hidden object is one thing over another. An officer's factually supported reasonable suspicion that a hidden object might be a weapon does not diminish even when the object could be something else. Leaving this heightened standard for frisks intact would not limit an officer's ability to make investigative stops, but it would increase the safety risk once those actually armed and or an officer cannot dispel a suspicion that the person is armed. The frisk here was constitutional. The court does not have to reject or discredit the concern raised by the panel concurrence or the amici to conclude that this frisk, in this case, was conducted within the four corners of binding Supreme Court precedent. The judgment should be Kerry talks about a search for a seizure being reasonable both at its inception and as conducted. So you don't disagree, do you, that there are orders or measures that might be undertaken during a stop that was lawful at its inception that could result in a Fourth Amendment violation? I do not disagree. And so what makes the order here then to assume the search position? Let's assume this is different from MEMS. MEMS is just about an order to get out of the car. What makes the order here reasonable? The order here is reasonable because the officer reasonably suspected that Mr. Weaver was armed. The government doesn't dispute that this was an order given in advance and in preparation for a frisk. But that's not to say that this order couldn't also be reasonable in a situation where reasonable suspicion did not exist because of the general need for officers to maintain safety on the scene during a lawful traffic stop. And could you, in your briefing, you talk about the fact that we would create a circuit split were we to hold that Officer Tom's order was a search. Could you elaborate on that? I'm not sure that that was a position the government took. I did see that one of the amicus parties did say that it would create a circuit split, and I don't see that that is accurate. The government cites two, three different courts of appeals that have held, in fact, that a search doesn't commence with an order or rejected an argument that an order is what commences a search. The amicus party that suggested... Oh, I'm sorry. That's what I meant. I may have misspoken. You cited to the Fourth Circuit and the Tenth in saying that we would create a circuit split with them if we were to say that the verbal order here was a search as opposed to not being a search. Oh, I see. I apologize, Your Honor. Yes, that's correct. If this rule stands saying that verbal order is a search, that would diverge from three different courts of appeals, the Fourth, the Tenth, and the Seventh as well. Thank you. Judge Calabresi? Yes, I have several questions, so I hope you will answer them quickly. My first question is, you seem to say that there can be an order to spread eagle, to get out and spread eagle, without any other evidence. What is the difference between that and ordering somebody to get out and put handcuffs on them? Well, of course, every Fourth Amendment event is judged by its reasonableness, and there are situations where it would be reasonable to put someone in handcuffs, and there would be situations where it would be reasonable to have them... Okay, so in other words, the question is whether spread eagling is in itself demeaning itself, but you have to have some reason for it. Coming out and putting your hands up, questionable. Coming out with nothing is fine. Okay. Now, in most of the cases in which there has been denied suppression, there has been evidence by an experienced officer that otherwise innocuous actions were dangerous, like pulling waistbands. Who was the experienced officer here who can be believably said to have so interpreted the things? I think it's Officer Tom. How do you make that consistent with the fact that the officer had Mr. Weaver reach into his head? In other words, if a previous thing suggested that he might be armed, that would be incredibly dangerous, wouldn't it? Well, an officer, even with a reasonable suspicion, isn't required to immediately do a frisk. There can be an opportunity to try to dissolve... No, no. My point is a simple one. I don't see any evidence that an officer here consistently said that the pulling of the pants up, for instance, was an indication of a gun when immediately after there was a stop, he let them do something which is inconsistent with having viewed him having a gun in his waistband. Officer Tom did say prior to the suppression hearing in his affidavit that he believes that Mr. Weaver may be carrying a gun based on his movements in the car. But then why would he let him put his hands in his pocket? Why would he possibly, if he believes... I'm not saying subjective intent. I'm not interested in subjective intent. I'm interested in whether there is an experienced officer who has testified believably that seemingly innocuous things that people do all the time, like pulling up their pants, in the context suggested more when he did something that was inconsistent with that. Well, there was nothing, again, requiring an officer to immediately escalate to the limits of what he could do. He asked... Can you tell me some other things? What is the relevance of the office of Mr. Weaver looking at a tinted car? Why is that relevant? Because it was unusual to the officers. It caught the attention of both Officer Ponce and Officer Tom. I mean, why does the fact that somebody who sees a car, which has tinted windows, look at it, that somebody is armed and dangerous? Well, I don't think that fact alone did indicate that he was armed and dangerous. I don't think anybody testified that he did. No, here's my point. The district court relied on a combination of different things, several of them, like that, or I don't got nothing, which I find hard to see as relevant. If the district court reached its conclusion on the basis of some factors that are not relevant, shouldn't we send it back to the district court and say we considered only on the basis of factors that are relevant? Well, only if the court were to conclude that, but in not giving weight to certain factors, there was still not reasonable suspicion based on the remaining factors. Well, but then you're asking us, you're asking us to make a decision that in these cases, since it is based very much on the district court's experience, the district court should make. So yes, of course, if we were to say that some factor was by itself enough without more, we could do it. But isn't our usual practice if a district court considered something that it shouldn't have, to send it back and say, consider the thing on the basis of what it should have considered? The existence of reasonable suspicion is a legal question and it's one that this court reviews to know about. On the basis of appropriate factors, yes. I have one final question, and that is the Wren case says that motive is irrelevant with respect to a traffic stop. And we can't look to whether this was stereotyping or whatever, but does that mean that if we believe that the motive for the stop was in fact stereotyping, can we take that into account in deciding the believability of the testimony of the officers who made that stop? In other words, the stop is valid and therefore there was a proper seizure. But if the police did that for improper motives, can we not take that into account in deciding how believable the police are in saying that they were frightened or whatever? If this court were to make a credibility determination with respect to the witnesses here, I don't think Wren precludes considering the motive for the stop in assessing credibility. Thank you, Counselor. Judge Kalabresi, we're moving on to Judge Cabranes. Yes. Thank you. Counsel, the panel majority conceded that the automobile stop was lawful. And secondly, that Weaver had given the officers reasonable suspicion that he was hiding something. If, in fact, all had proceeded exactly as the record suggests and there was no weapon, but they discovered they came upon illegal drugs, as they did in fact, but there was no gun, would that search have been lawful? Yes, Your Honor. The reasonable suspicion doesn't have to be proven. If there's a reasonable suspicion that the person may be armed and dangerous as there was here, then it's a lawful risk. All right. Thank you. Judge Koehler. Yes. I want to ask you a question, Counsel, that I asked opposing Counsel, and it has to do with the armed and dangerous analysis. To get to this gun that Calvin Weaver was carrying, Officer Kwan had to unzip his fly and then unbutton his long underwear, then reach into his groin area. So this gun was not, like in Hussein, readily accessible. Shouldn't this affect our armed and dangerous analysis? There's no suggestion that before finding the gun, the officer thought or knew that it was in Mr. Weaver's underwear or in his groin area. You know, the frisk of his outer clothing revealed that that's where it was, and that's where it was found. But the suspicious movements that Officer Tom observed... Here's my question, Counsel. Was it dangerous if you had to go and dig it out? He couldn't reach for it while he was standing there, spread eagles. Could he? The officer couldn't know when he saw the suspicious movements around the waist area and the pelvic area near the top of his pants. There's no way to know that the gun wouldn't be accessible. And it's also not clear that this gun was inaccessible, for example, through his waistband and down into... Let me move on. Can you tell me how and why this case winds up before a federal grand jury after Judge Miller of the Onondaga County Court, in a thoughtful and rather complete opinion, suppresses the fruits of this search? The state court judge suppressed the evidence in part because they found no reasonable suspicion for criminal conduct, which wasn't... You have the same facts, didn't you? You have the identical facts. Largely the identical facts. There was not any evidence, at least as apparent from the decision, about the observations of Mr. Weaver before the stop. And there's no indication that there was in-court demonstrations of the movements that Officer Tom observed as there were in front of Judge Sotheby. And the state court also credited the testimony of the officers as Judge Sotheby did. Right. So that doesn't answer my question. After that opinion by Judge Miller, how does it get brought before a federal grand jury? Because the judge is on a different standard than what would need to be proven in federal court to prove a federal crime. Just a second. Isn't it the same standard as 140.50, which is of state law? Isn't that the same standard? It may be the same standard, but it does not seem to be what the county court applied, because the county court was looking for criminal conduct. And there was no I'm not sure that that was the appropriate standard to apply in a traffic stop situation, even under state law. But certainly on the face of the decision, there was a consideration that wouldn't be taken into account in front of the federal grand jury. Counsel, I have one more question. When this car turned right onto Delaware Avenue, it was the only direction it could go. Isn't that true? Correct. And so it was really a pretextual stop for failure to signal, because when you're in a corner like that, the only way you can go is right. Isn't that correct? The district court found that this is a valid traffic stop based on a valid traffic violation, or at least a reasonable belief in one. And that's not a finding that Mr. Weaver challenges in front of this court. Thank you, Counselor. Judge Chin. Thank you, Chief. Ms. Schoenberger, just to follow up on what Judge Pula was asking, it's not an unconstitutional stop, because the Supreme Court says you can make pretextual stops, right? But really, as a matter of common sense, do you really stop someone for not signaling a football field away from the turn? It's a valid violation of the traffic law. Well, I mean, the fact that the reasoning is extremely thin, I mean, does that get mixed into the weighing of all of the different factors here? Like the degree of severity of the traffic violation? Well, you know, I mean, when I was walking into the courthouse this morning, I made a point of staring for a couple of seconds at vehicles. And I thought, well, what does that tell me? And my answer is nothing. You know, I pull up my pants. What does that tell me? Nothing. And so my question is, what really is there here to indicate that Mr. Weaver was armed and dangerous and that he had a weapon? Well, the nature of the traffic stop has nothing to do with the factors that show that he was armed and dangerous. Those factors have to do with his unexplained and unusual movement. But it seems to me the nature of the stop suggests that there is some other motive here to stop. I mean, to stop someone for that reason suggests that it was pretext and that they had some ulterior motive. And that may be constitutional under the case law, but it still adds to the entire picture, does it not? A unanimous Supreme Court in Wren said otherwise. Okay. Thank you, Judge Chen. Judge Lillie? Thank you, Chief Judge Livingston. Judge Schoenberger, I've got just a few quick questions about the record and then a larger question. First, is there anything in the record that shows that the officers had any prior experience with Mr. Weaver or any of the men who were in the car? No. Is there anything in the record about why police ask individuals to spread eagles in the context of a traffic stop where they tell the people in the car to get out of the car? There wasn't discussion about that on the record, no, Your Honor. And I want to ask you about verbal directives. And I was interested in what you said that, as I understand, that a search requires a physical trespass or a privacy invasion. Is that right? Excuse me, Your Honor, I just didn't hear the question. I think someone was coughing. You said that a search requires a physical trespass or a privacy invasion. Is that...did I hear you right? Yes, Your Honor. Okay. And I'm just thinking about this verbal directive issue. Would you agree that there are at least some verbal directives from armed police officers, like, for example, empty your pockets right now, and it depends on the level of the voice, I guess, or undress, that can qualify the search, even though there's no physical trespass? No. Yes, certainly, Your Honor. And I would say that there are physical trespasses in those cases. It's just not the hands of the officers that are causing...well, the hands are not conducting the trespass, but it's the officer directing someone to create the trespass. Right. So in that case, it's the individual itself. It's him or herself who's complying. That's right. Almost acting as the agent of the officer, yes. Okay. So it's not a bright line rule about verbal directives. And then I want to ask you two things about race and also high crime areas. The first is, if there were statistics that showed that 100% of African Americans who engaged in a trafficking faction, say of the sort that occurred here, were stopped, and no one else of any other race or ethnicity was stopped, what could we draw from that statistic? Just assume that that's true, in connection with a motion to suppress. With respect to this particular motion to suppress? Yes. Yes. I mean, the court would still need to review the facts in front of it and the totality of the circumstances to determine whether there was reasonable suspicion here. There's a series of facts in this case. They're all race neutral. So even if there were 5,000 cases in every case of a trafficking faction involved an African American driver and passengers, you'd have to go through the same... The district court would have to go through the same analysis without reference to the larger statistic. Is that what you're saying? Because the remedy wouldn't be one under the Fourth Amendment. And this is what Wren talked about when confronting this very question of racial discrimination. Let me turn to the high crime area issue, because we don't really appear to ever really define what a high crime area is. As I understand it, on this record, the area was defined as the west side of Syracuse, which I think is a lot of described as a high crime area at a relevant time. So here, there was evidence beyond just a label that this was a high crime or dangerous area. Both Officers Quance and Tom testified regarding the types of crimes they'd responded to in that area. But that was for the west side of Syracuse. Is there anything indicating that the location where the stop happened was itself a high crime area? Yes. So Officer Quance identified a map that was put into evidence and is part of the record. It's about a three or four block radius area, and identified that as being in the near west side of Syracuse. Is there any reason why we wouldn't require or shouldn't require more than an area? Because in New York, at least in New York City, there's comp stat data, there's other data that might confirm that an area is in fact a high crime or could be labeled as a high crime area. I mean, I could see how additional facts could give the court reason to give more weight to the assessment than one or two officers' testimony. So do you agree that so far we don't have a standardized set of criteria that we can point to that courts might use to determine whether an area is a high crime area? I agree with that, Your Honor. Thank you. Judge Harney? Yes, following up a little on Judge Loya's questions. Do you agree that a directive to spread EGLE is more intrusive and humiliating and degrading than an ordinary Terry pat-down? Or do you see them as interchangeable? I'm not sure the difference between a pat-down and being told to get in a position that could lead to a pat-down. They, I mean, I think that they are, I don't see a meaningful difference. I think, and I think they're quite... So being directed to spread one's legs and arms, expose one's inner thighs, for example, not necessarily more intrusive and humiliating doing that in public than just standing there? I think the case would support a conclusion that, in fact, the pat-down, because there's physical contact with the body, is something more intrusive. And in fact... The spread EGLE, yeah. Oh, pardon me. In the Supreme Court case, Pennsylvania v. Mims, Judge Stevens, in dissent, actually talks about the distinction between a frisk and this very position, leaning on the hood, he says, and spreading hands and arms. And interestingly talks about it in terms of being a safety position and distinguishes it from a frisk. I'll be brief. And if part of the concerns that have been expressed is about the ability to stop people in cars on pretext, and then pursuing these as a pat-down or directives to intrude on one's personal space in what's potentially an arbitrary or racially discriminatory way. And part of the answer that I've heard is that, well, that isn't really a Fourth Amendment problem. That's a different problem entirely. But as Judge Loyer was suggesting, if there was significant statistical evidence, one might make out a different kind of case, Fifth Amendment case or 14th Amendment case. But what's an individual to do with that? Is there any... There's no remedy once you get past the prosecution and the motion to suppress, right? You have a different civil suit. I think that's correct, Your Honor. A different civil suit is the remedy that is contemplated by the Supreme Court in rent. So the government's position is that may be going on, but that doesn't have anything to do with the exclusionary rule motions to suppress in criminal prosecution. Is that right? Your Honor, I mean, you can certainly take seriously the concerns that are raised in this case and concerns about discriminatory applications of these laws. But you can still at the same time agree with Chief Judge Livingston that the panel decision here presents a misapplication of Fourth Amendment law. Well, looking again at the fact and the adjustment of a waistband or staring at a car going past you with tinted windows at the end of the day in an area that has been characterized as a high crime area, if you transport those facts out of the high crime area, adjusting a waistband isn't always going to be associated with carrying firearms. Those could be seen as quite innocent actions. So the ability of the government to amplify the analysis of reasonable suspicion seems remarkable in these cases. And that's why I'm concerned about the effect. What can you tell me to assuage my concerns? Well, Your Honor, the facts that you referenced here only become relevant to the analysis in this case when they're viewed in conjunction of the observations that the officer makes of Weaver once they stop him. And I'll just remind the court that Mr. Weaver wasn't stopped or frisked based on the observations of him on the street. The officers see him and drive past. They don't follow the car. They encounter the car later. That's true, but the car was stopped for failing to signal in a way that any of us on this call might have failed to signal any number of times. In fact, you pull up to the stop sign. You just realize that you decided to turn left or right. And then you put your signal on, but you still had a traffic violation. So the kinds of traffic violations, the reason that they, in fact, stopped them was because of the prior sightings. Well, I don't think we know that. I mean, I don't think we do know that, Your Honor. The officers testified that they were proactively policing in this area. It was part of the beat that they were on. And it may be that they use traffic stops as tools of proactive policing and that it happened to be the car of the same person that they had recently observed. There's not an why they made this stop. Thank you, Counselor. Thank you very much. Judge Sullivan. Thank you, Chief Judge Livingston. Ms. Schoenberger, I just want to make sure I understand your argument. You're really arguing that there was reasonable suspicion to search Mr. Weaver before he got out of the car, right? That's correct. Okay. And the facts sort of that are relevant to that, I mean, they're listed in Judge Sutter's decision, but the fact that it's a high crime area is one of them, right? Correct. Okay. And so at least I looked at the record, it seems to be what one of the officers testified to was regularly shots fired, multiple homicides, stabbings and shootings. Was that disputed at all? It doesn't seem like that's a disputed issue of That was not disputed. Okay. And so I guess I want to shift now just to the spread eagle position. It was suggested by your adversary, Mr. Egan, that there's no other reason to do that other than to be searched. Do you agree with that? Is there anything in the record that goes to that? The government disagrees with that and talks about plausible reasons that an officer would order that position for safety considerations with no intention of commencing a search. There wasn't a discussion about this on the record in part because at the time that the officer made the order, there was reasonable suspicion, but before the search could even begin, there were additional factors that supported his reasonable suspicion. No, but there was a hearing, right? Yes, there are. So was there anything at the hearing to suggest that this is only consistent with one purpose, which is the search? No, your honor. Okay. I have nothing further. Thank you, Chief. Judge Bianco. Thanks, Chief Judge Livingston. Ms. Schoenberger, you said at the beginning that the county majority announced two new rules of law. I want to focus on the second one and what the impact would be on police officers going forward. So the county majority said on page 103, we have no doubt that Officer Tom reasonably suspected that Weaver was hiding something based upon what the officer saw. The issue was that it wasn't clear whether or not it was drugs or a gun. Is that essentially what this case comes down to? There was no outline of a gun. It was reasonable suspicion to believe he had something illicit in his pants, but the officer couldn't tell whether it was a gun or, I think the only other based upon his experience, it would be drugs or it would be a gun, right? Yes, and I mean, it could even be something else. It could even be something innocuous. That doesn't diminish the reasonable suspicion that it could be a gun. Right, but he's crossed the threshold already. My point is that Mr. Egan said he didn't have a particularized suspicion required under Terry. He had a particularized suspicion. He just couldn't determine at that moment whether it was drugs or a gun, essentially, right? And so we would uphold the panel decision. We'd be telling a police officer, if you have reasonable suspicion that someone either has drugs or a gun, you can't do a gun or a drug. You can't do anything. It has to be more likely to be a gun than the drugs, right? Yes, I mean, the concern here is that, yeah, that's the concern. That's completely inconsistent with what the Supreme Court has said, which is that reasonable suspicion is considerably less than a preponderance, right? So this would be like, there's no other case out there even remotely announcing such a rule. Yes, Your Honor, it's a new rule and a very problematic one. All right. My other question, and Chief Judge Livingston, I think, asked you about this as well as some other judges. If we adopt your view of a new Fourth Amendment event, there was no trespass here, didn't reveal anything, the arm was already revealed. Essentially, the rule would be that police officers could order an in-search position, a Spartan Eagle on the car for every traffic stop. I think that would be the government's position, right? The rule is that they could order that without a reasonable suspicion or particularized suspicion. Of course, as I said before, every stop and every order is assessed for reasonableness. The government's position is, if you have a basis to do a lawful traffic stop, you also, for safety, can order that in every stop? Well, certainly the officer can order a variety of positions based on the circumstances in order to maintain safety. This could very well be one of them. All right. Thank you. Judge Park? Thank you. Tonsa, I just have one point of clarification. Did Mr. Weaver first push his pelvis against the car before or after Officer Tom touched him, or was it both? It was both. When the officer first told him to go to the back of the car, Mr. Weaver does so. At the suppression hearing, Officer Tom described it as he put his pelvis very close to the car. In earlier parts of the proceeding, including a pre-hearing affidavit, police report, and Officer Tom's state court testimony, he described it more as pressing his pelvis. Certainly, it was a movement of leaning his pelvis in towards the car before he was ever touched. Then, after Officer Tom touched his waist to begin the frisk, that's when there was two more pelvic thrusts towards the car. Before Officer Tom put his hands on him, the first incidence of him leaning his pelvis towards the car should be considered part of the carry analysis. That's the government's position, right? Correct. That and the fact that Mr. Weaver said that he was in that position because it was slippery and Officer Tom did not see anything that would support his assertion that it was slippery. Okay. Thank you. Judge Nardini? Thank you. To go back to this point about the nature of the area, the known crime rate in the area, as I read the record, the officer's testimony went beyond just saying in some sort of generic way that this was a high crime area, right? They talked, both of them, I think, about regularly shots fired. Then another one, they talked about a high volume of shots fired, correct? Yes. In your view, given the defense's apparent concession that there was reasonable suspicion to believe that Mr. Weaver was hiding something when pulled over by the police, in your view, does the fact that there was an unusually or some high incidence of shootings, in particular, and gun-related crimes factor into the reasonable suspicion analysis in terms of whether it was equally likely to be a gun as any other random thing he might be hiding? It's a relevant consideration, Your Honor. Okay. I add nothing further. Thank you. Judge Menasci? Yeah. On this point about whether it's equally likely that it was a gun or drugs or something other than a gun, I had put that question to opposing counsel and asked about the panel's characterization of Weaver's actions being equally consistent with one or the other. He said, well, it was fair to say that that's not really the standard that's being applied and that on the record, it seems like something much less than 50% would be the odds that Weaver had a gun. I was wondering if you had a reaction to that and what you think the record reflects as to what an officer might reasonably conclude about the odds. Well, I think that the panel majority rule says that even though they're equally consistent or equally likely, that you couldn't risk on that basis. So, that certainly seems to be something like a preponderance standard. Okay. Thank you. We will hear a rebuttal. Mr. Egan? This case is not just about Calvin Weaver. It's about the gradual erosion of the Fourth Amendment, especially for entire communities of African-American and Latino people who are disproportionately stopped and frisked at alarmingly higher rates without success. It's also about how this reality has been facilitated by the police's reliance on and subjective considerations. It is about how in the exceedingly rare instances these overbearing practices turn up evidence, amorphous factors may become further skewed by courts seeking to affirm convictions. So, it is in this case, if this court's not careful, that 30 minutes before sunset becomes dusk. You looking at a car with tinted windows as it slowly passes becomes you suspiciously staring to avoid police surveillance. Pulling up your pants becomes you adjusting your waistband weighed down by a hefty object. A throwaway response to a forceful and loud command to raise your hands becomes you suspiciously volunteering you don't have anything. A passenger behind you who briefly opens his door before being ordered to shut it and then fully complying with subsequent orders becomes his attempt to flee the vicinity of your supposed criminality. Your small step becomes a very small step. You doing something unusual becomes something frankly alarming. You kind of squirming and kind of pushing on your pelvis becomes you frantically pushing something into your pants. And finally, something, anything really, becomes a weapon and a justification to order you into a spread-eagle position and to intrusively pat you down. The hydraulic pressures that subtly push the law in this direction may be difficult to resist, but if they are not, the case will serve as further justification to trample upon the personal security of anyone who has the misfortune of catching the eye of the next proactive police officer, even though that future intrusion will have little chance of turning up any evidence, but will certainly exacerbate community resentment and distrust. Thank you. Thank you, Mr. Egan. The matter has been argued and we will take it under advisement. I'll ask the clerk to adjourn court. Court is adjourned.